IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHELLE HETZEL

**FILED**

JUN 2 : 2009

MICHAEL E. KUNZ, Clerk
By_____: Dep. Clerk

v.

MARIOSA LAMAS
Et al.,

CIVIL ACTION

NO. 08-3651

OPINION

NORMA L. SHAPIRO, J.                              June 22, 2009

Michelle Hetzel (Hetzel), an inmate at the State
Correctional Institution at Muncy, Pennsylvania, filed a
petition for writ of habeas corpus under 28 U.S.C. §2254.
The Honorable Arnold C. Rapoport, United States Magistrate
Judge for the Eastern District of Pennsylvania (Magistrate
Judge), filed a Report and Recommendation ("R&R")
recommending the petition be denied.  The R&R will be
adopted in part and the petition will be denied.  However,
a Certificate of Appealability ("COA") will be issued
regarding the denial of petitioner's motion for change in
venue/venire.

I.    BACKGROUND

Despite being married to Brandon Bloss (Bloss), Hetzel
was sexually involved with the victim, a 19 year-old woman,

1

Devon Guzman (Guzman).  Bloss, aware of the women's
relationship and angry about the attention and money Hetzel
expended on Guzman, was contemplating divorce.  Guzman was
also in a sexual relationship with Keary Renner (Renner),
another woman, with whom she lived.  Hetzel, Renner and
Guzman were high school friends.  Although Guzman and
Renner lived together, Guzman met with Hetzel on a regular
basis.  Typically, Hetzel would arrive at the house of
Guzman's father and ask him to call his daughter.  He would
do so and his daughter would arrive shortly thereafter.

On the night of June 14, 2000, Hetzel and Guzman were
at Mr. Guzman's home with him, his girlfriend, and his
sister.  Everyone was drinking alcohol.  Hetzel and Guzman
had just returned from a vacation in Puerto Rico, where
they had exchanged rings.  Hetzel paid for the trip.  At
some point the two women began arguing.  Hetzel was upset
that Guzman had not moved out of Renner's residence and did
not intend to do so. The women ultimately left Mr. Guzman's
house, each departing in her own car.

When Guzman arrived home, she told Renner that Hetzel
had proposed to her, but that she had broken up with Hetzel
and returned the rings Hetzel had given her.  Renner
noticed that Guzman had been drinking and the women argued
about Hetzel.  They began a physical fight, but were

2

interrupted by a series of pages from Hetzel's home.
Guzman called Hetzel's number and spoke with Bloss.   Renner
could hear Bloss speaking to Guzman and Hetzel screaming in
the background.   After the call, Guzman informed Renner
that Hetzel was sick and needed her attention.   Renner
insisted on accompanying her to Hetzel's home.   When the
women arrived, Renner stayed in the car and heard Bloss
tell Guzman at the doorway that Renner would have to leave
because Hetzel did not want her there.   Guzman came back to
the car and told Renner that she was taking her home and
would return to Hetzel's house.   A neighbor saw Guzman at
the doorway and watched as she approached her car, banged
on the hood, and told her passenger that she was taking her
home.

    Guzman dropped Renner at their home at approximately
11:30 PM, told her there was nothing to worry about and
explained that she would be back soon.   Over an hour later,
at approximately 12:45 AM, Renner received a call from
Hetzel who told her that Guzman never returned to Hetzel's
home.   At 2:30 AM, Hetzel arrived at Renner's residence
with Bloss.   Bloss stayed in the car while Hetzel and
Renner talked about Guzman's disappearance.   Hetzel asked
Renner to call the police and report Guzman as a missing
person, but Renner refused to do so because Guzman "left

3

before but she always came home." Hetzel then called the Forks Township Police Department and reported Guzman as missing. After giving a description of Guzman to police, the women called some friends and family members in an effort to find her. Several times, Hetzel called police to learn whether they had located Guzman. Hetzel left Renner's place at about 6:30 AM.

Later that morning, Hetzel returned to Renner's residence with food and suggested that the women drive around Easton looking for Guzman's car. Hetzel suggested they search Canal Park, a place she and Guzman often visited together. At the park, they saw the car. Inside the car they discovered Guzman. She was covered with a green jacket and lying across the backseat with her back toward the front seat. Renner noticed that Guzman's eyebrows and lips were purple and so she told Hetzel that they should take her to get help. A city employee who was present at the park told the women that police were on their way and that they shouldn't move the body. Police arrived, checked for a pulse and, finding none, called the coroner.

The coroner removed the green jacket and saw that Guzman's throat had been cut and she had a "massive gaping laceration" to her neck. The wound was a "four inch long

4

cut that went almost to her spine; it severed Guzman's tongue and cut in half the right carotid artery and the right jugular vein." Also found on the body was a syringe containing a clear liquid. There was no cap on the syringe. Police, securing the scene, insisted that Hetzel's vehicle remain in the lot. Both women were interviewed and released. Bloss was also interviewed by police later that day.

After their interviews with police, for about six weeks Hetzel and Bloss remained married. Hetzel announced to family and friends that she was pregnant with twins, an assertion that was not true. The couple also took a vacation to Mexico together. Meanwhile, the police investigation focused on Hetzel and Bloss. Hetzel's car was searched, as was the home she and Bloss shared. The searches yielded items of physical evidence. From the trunk of Hetzel's car police recovered two pair of rubber gloves, Bloss's T-shirt and a pair of his jeans with blood consistent with Guzman's blood, and Bloss's sweatshirt, socks and sneakers, with indications of human blood too weak for further testing. At the couple's home on the day after the murder, police found a pair of Hetzel's jeans soaking in the washing machine. In a presumptive test, the water tested positive for blood. In the pocket of Hetzel's

5

jeans was a syringe cap matching the open syringe found on Guzman's body.

Police also recovered physical evidence from Guzman's body and her car. On the green jacket that covered her were hairs consistent with Hetzel's hair. In the car were hairs consistent with Bloss's hair. Guzman's pager was not clipped to her pants as Renner described last seeing it; it was found unclipped under the waistband of her pants. Police seized telephone records from the Hetzel/Bloss residence and learned that there had been numerous calls from that address to Guzman's pager the night of the murder. All those calls on the page had been erased.

Police examination of trash set out by Hetzel and Bloss revealed numerous bandages, one of which appeared to bear the pattern of a bite mark. Police sought and received a warrant authorizing them to photograph Bloss and the photographs revealed an injury on Bloss's left forearm. A forensic odontologist concluded that the injury was a human bite mark consistent with Guzman's dental records.

Hetzel and Bloss were charged with first-degree murder and despite Hetzel's effort to sever their trials, they were tried jointly. In addition to witnesses describing the events and those testifying about the investigation and forensic evidence, the Commonwealth presented other

6

witnesses.

Cara Judd, a woman who had dated one of Bloss's sisters, testified that Hetzel admitted she killed Guzman.[1] According to Judd, Hetzel explained that she was very angry that Guzman brought Renner to her home on the night they argued. When Guzman returned alone, the two women began to fight. Guzman bit Bloss when he attempted to intervene on Hetzel's behalf. Hetzel grabbed a knife and the next thing she knew there was blood everywhere. Judd also testified that Hetzel told her about soaking her jeans in the washer and that Bloss had hosed down the garage where the murder had taken place.

George Vine (Vine), a friend of Hetzel and Guzman, testified that Hetzel offered him sex or money to get rid of Guzman approximately two or three months before the murder.

Bloss presented no evidence in his defense. Hetzel offered the testimony of several witnesses, including her mother, who told the jury that Bloss admitted to her he killed Guzman. Hetzel took the stand and testified that she was not involved in the murder and that she believed

---

[1] The spelling of Judd's first name is not consistent in the state court record.

7

Bloss committed the crime.

The jury found both defendants guilty of first-degree murder but acquitted them of conspiracy to commit murder. They were sentenced to life in prison.

On direct appeal, Hetzel raised eleven claims of error, including that the trial court erred:  1) with regard to the jury instruction on the specific intent element of accomplice liability for first degree murder; 2) in not granting Hetzel's motion for a change of venue or venire; 3) in dismissing a seated juror; 4) in the admission of inflammatory photographs; and 5) in not granting her motion for severance.  She also asserted insufficiency of the evidence to support the guilty verdict.  A. 63.

On March 14, 2003, the Pennsylvania Superior Court affirmed the judgment of conviction and sentence.  Hetzel, 822 A.2d at 768.  The Pennsylvania Supreme Court denied Hetzel's petition for allowance of appeal on December 3, 2003.  A.70 (Commonwealth v. Hetzel, No. 253 MAL 2003 (Pa. Dec. 2, 2003)).

Hetzel filed a counseled petition under the Pennsylvania Post Conviction Relief Act, 42 Pa. CONS. STAT. ANN. §9451.  She raised as issues for review that trial counsel was constitutionally ineffective for:  1) failing

8

to object to the trial court's accomplice liability instruction; 2) failing to investigate and cross-examine Commonwealth witnesses properly and adequately; and 3) failing to present evidence of Hetzel's good character for peacefulness.   The PCRA court, after an evidentiary hearing, denied the petition and the Superior Court affirmed.   The Supreme Court denied Hetzel's petition for allowance of appeal on June 10, 2008.

Hetzel's federal habeas petition raised the following claims:  1) the trial court denial of her request for change of venue or empanelling a jury from a different county violated her due process rights; 2) trial counsel was constitutionally ineffective for failing to object to the trial court instruction on accomplice liability; 3) the trial court denial of her motion to sever her trial from that of Bloss violated her due process rights; and 4) the trial court dismissal of a seated juror violated her right to jury trial and due process.

The Magistrate Judge filed an R&R recommending that: (1) the state court's application of Strickland to Hetzel's ineffective assistance claim was not unreasonable; (2) Hetzel's due process claim based upon the denial of her motion for a change of venue/venire has no merit; (3) the state court denial of her motion for severance was not

9

exhausted and neither contrary to, nor an unreasonable
application of, Supreme Court law, and (4) Hetzel has not
exhausted her Sixth Amendment claim regarding the removal
of a juror mid-trial.  The Magistrate Judge recommended
that this matter should be dismissed without an evidentiary
hearing, and there is no probable cause to issue a
Certificate of Appealability.  Hetzel filed timely
objections to all claims.

## II.    DISCUSSION

Under 28 U.S.C. §2254, a federal court has
jurisdiction over habeas corpus petitions from individuals
placed in custody by a state court.  Obado v. New Jersey,
328 F.3d 716, 717 (3d Cir. 2003).  The Antiterrorism and
Effective Death Penalty Act of 1996 (AEDPA) governs habeas
review of state convictions under §2254.  Under AEDPA, a
petitioner must prove that the state court adjudication
resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established federal
law, as determined by the Supreme Court of the United
States.  28 U.S.C. §2254 (d)(1).  Objections to the R&R are
reviewed de novo.  Izzard v. Kyler, No. 02-CV-8515, 2004
U.S. Dist. LEXIS 25753, at *10 (E.D. Pa. Dec. 22, 2004).

Under AEDPA, the "contrary to" and "unreasonable
application of" clauses have independent meanings. "A state

10

court decision will be contrary to our established precedent if the state court either applies a rule that contradicts the governing law set forth in our cases or confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our own precedent." Penry v. Johnson, 532 U.S. 782, 792 (2001). A state court decision is an unreasonable application of Supreme Court precedent if the court "correctly identifies the governing legal rule but applies it unreasonably to the facts" of the case. Id. The appropriate inquiry to be made under the "unreasonable application" standard is "whether the state court's application of clearly established federal law was objectively unreasonable." Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000). A federal habeas court may not grant relief unless the court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable. State court findings of fact are presumed correct unless the petitioner rebuts the presumption with clear and convincing evidence. See 28 U.S.C. §2254 (e)(1).

A prerequisite to federal habeas corpus relief under §2254 is exhaustion of all claims in state court prior to requesting federal relief. Lawrence v. Florida, 549 U.S.

327, 341 (2007). Principles of comity "dictate that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." O'Sullivan v. Boerkel, 526 U.S. 838, 839 (1999). A federal court may raise the lack of exhaustion *sua sponte*. Day v. McDonough, 547 U.S. 198, 214 (2006).

To exhaust, a petitioner must fairly present his claim to alert the court to the claim's federal nature. Baldwin v. Reese, 541 U.S. 27, 29 (2004). A state prisoner has not fairly presented a claim if the reviewing state court must look beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion, that does so. Id. at 32. "The burden of establishing that claims have been fairly presented falls upon the petitioner." Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997).

**A.    Denial Of Motion For Change Of Venue**

The first objection raised by the petitioner is that petitioner's due process rights were denied by the trial court's refusal to grant a change of venue/venire because of pretrial publicity and media coverage. Under Pa. R.

Crim. P. 584, such a change is warranted if a fair and
impartial trial cannot be accomplished in the county where
the crime occurred.  The adequacy of voir dire is not
easily subject to appellate review because the decision
maker is privy to hearing and observing the jurors before
reaching conclusions as to their impartiality and
credibility.  Rosales-Lopez v. United States, 451 U.S. 182,
188 (1981).

　　　The trial court noted:

> 　　　[A] defendant is not entitled to a change of
> venue unless he or she can show that pre-trial
> publicity resulted in actual prejudice that prevented
> the impaneling of an impartial jury. . . .   Pre-trial
> publicity will be presumed to have been prejudicial if
> the defendant is able to prove that the publicity was
> sensational, inflammatory, and slanted toward
> conviction, rather than factual and objective; that
> such publicity revealed the defendant's prior criminal
> record, if any, or referred to confessions,
> admissions, or reenactments of the crime by the
> defendant; or that it was derived from official police
> and prosecutorial reports.  Even if the defendant
> proves the existence of one or more of these
> circumstances, a change of venue or venire is not
> warranted unless he or she also shows that the pre-
> trial publicity was so extensive, sustained, and
> pervasive that the community must be deemed to have
> been saturated with it, and that there was
> insufficient time between the publicity and the trial
> for any prejudice to have dissipated.

Hetzel, 822 A. 2d at 764-65.

　　　The trial court, reviewing the media coverage,
concluded that the published reports were not "sensational,
inflammatory, nor slanted toward the conviction, but were

13

factual and objectively reported." Id. at 764. The court dismissed all jurors who may have had a fixed opinion or believed they were unable to be fair or impartial. While many of the jurors had some knowledge of the crime from media coverage, all jurors empanelled testified under oath they could be impartial and decide the matter consistent with the court's instructions based upon the evidence adduced at trial. Id. The Superior Court upheld the trial court refusal to grant a change of venue/venire.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the right to a "trial by an impartial jury free from outside influences." Sheppard v. Maxwell, 384 U.S. 333, 362 (1966). Failure to accord an accused a fair hearing violates even the minimal standards of due process. Irvin v. Dowd, 366 U.S. 717, 722 (1961). Two elements must be considered to decide whether a change of venue/venire is required because of pretrial publicity; "presumed/probability of prejudice" and "identifiable/ actual prejudice."

### 1.   Presumed Prejudice

Identifiable prejudice to the accused need not be shown if the totality of the circumstances raises the probability of prejudice. Sheppard, 384 U.S. at 352. When a procedure employed by the state producing a high

14

likelihood that prejudice will result is deemed inherently lacking in due process, actual prejudice need not be demonstrated.  Id.  There are times when adverse pretrial publicity can create such a potential of prejudice in the community that jurors should not be believed if they claim they can be impartial.  Mu'Min v. Virginia, 500 U.S. 415, 429 (1991).

"Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." Rock v. Zimmerman, 959 F.2d 1237, 1252 (3d Cir. 1992).  The community and media reaction must have been so hostile and so pervasive that it is apparent even the most careful voir dire process would be unable to assure an impartial jury. Id.

Such cases are exceedingly rare and mere exposure to press reports or other community reaction concerning the case, or even a tentative opinion based on those reports will not establish a constitutional violation if the trial court found that each juror was able to put aside any and all outside influences.  Id. at 1253.

15

Potential prejudice can be dissipated if there is a large lapse in time between the widespread publicity and the trial.  In Murphy v. Florida, 421 U.S. 794 (1975), extensive media coverage regarding the petitioner's crimes was not prejudicial because the coverage concerning the petitioner appeared for two years, but it was seven months before the jury selection.  Id. at 802.  In Patton v. Yount, 467 U.S. 1025, 1034 (1984), merely remembering the facts of a case was not prejudicial.  Recollection of facts is found to linger much longer than feelings of revulsion fostering prejudice. The Court found it futile to identify a particular lapse in time as the point where prejudice would dissipate.  Id.

The Magistrate Judge is correct that the state court adjudication of presumptive prejudice was not contrary to clearly established Supreme Court law.  The trial court standard that pre-trial publicity would be presumed prejudicial if the defendant were able to prove that the publicity was sensational, inflammatory, and slanted toward conviction, rather than factual and objective was indistinct from the Supreme Court "presumed prejudice" standard.

The more difficult issue is whether the state court adjudication was an unreasonable application of Supreme

16

Court law.  The state court excused all jurors who seemed
to have a fixed opinion or believed they were unable to be
fair and impartial.  The majority of the jurors empanelled
to serve had some knowledge of the case through media
coverage, but none of them admitted having a fixed opinion
of Hetzel's guilt.  Although there are times when jurors'
claims of impartiality should not be trusted because of
very extensive media coverage, such cases are exceedingly
rare and the community and media reaction must have been so
"hostile and pervasive" that even the most careful voir
dire process would not have been able to empanel an
impartial jury.

The articles and media coverage at the time of the
crime and subsequent police investigations are less
critical under the Supreme Court presumed prejudice
jurisprudence than those immediately preceding juror
selection.  A lapse in time between publicity and trial can
dissipate prejudice that may have existed.

The first article in evidence was dated June 16, 2000.
The articles continued to the commencement of jury
selection on September 20, 2001.  The continued coverage
differentiates the publicity from that in Murphy, where
there was no media coverage in the 7 months before jury
selection. Any potential prejudice on behalf of the jurors

was unlikely to have fully dissipated just by passage of
time. Although some of the earlier articles might carry
less possible prejudicial impact, they should not be
discounted to the same extent that early media coverage was
in Murphy.

The question to be asked is whether the trial court
was unreasonable in determining that the publicity was not
sensational, inflammatory, and slanted toward conviction,
but factual and objective.

The media coverage was extensive.  Hetzel listed
seventy-two articles between the finding of Guzman's body
and the empanelling of the jury. There was a continual
reference in the articles to the "love triangle" of Hetzel,
Guzman, and Renner.  Many of the articles discussed the
gruesome details of Guzman's murder, as well as the
allegation that Hetzel offered Vine sex or money to kill
her two or three months earlier.  District Attorney
Morganelli called Hetzel and Bloss "amateurs" for planting
a knife and syringe on Guzman.  Bloss' court-appointed
attorney, said he expected the preliminary hearing to be
"packed with media" in an article published four months
after the discovery of the body, so at that time, media
interest in the case had not lessened.

18

Although most articles included a discussion of the investigation and relationship between Hetzel and Guzman as a possible motive for the killing, none of the articles were sensational or demanded a conviction. Four months after the crime, an article reported that there were many loose ends, including "where Guzman was when the killer ran a blade four inches across her neck." Omnibus Pre-Trial Exhibit Package for Defendant at Exhibit C, Commonwealth v. Hetzel, No. 3255-2000 (Ct. Com. Pl. Northampton Country, Pa. Crim. Div. 2001)(Article dated Oct. 16, 2000).  It reported there was blood on the victim's shirt that did not come from Bloss or Hetzel and added, "one should not make too many assumptions from a preliminary hearing."  Id. Even though the articles discuss the possibility, or even likelihood of Hetzel being involved in Guzman's murder, they appear to have been reasonably objective, not inflammatory, and not advocating Hetzel's conviction.  Many articles alluded to a possible motive for Hetzel to murder Guzman, but other articles warned the public not to jump to any conclusions.

Whether or not this court agrees with the state court decision denying Hetzel's motion for a change of venue/venire, under AEDPA, we may decide only whether or

not the state court unreasonably applied the relevant law; and it did not.

### 2.    Actual Prejudice

The relevant question is not whether the empanelled jurors knew of the murder, but whether they had such fixed opinions they could not impartially judge the guilt of the defendant. Patton, 467 U.S. at 1035.  It is not required that each juror be totally ignorant of the facts and issues involved.  Dowd, 366 U.S. at 723.  It is sufficient if the juror can lay aside any impression or opinion and render a verdict based on the evidence presented in court.  Id. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."  Uttecht v. Brown, 551 U.S. 1, 9 (2007).

Hetzel makes no attempt to demonstrate actual prejudice.  The state court determined that while a majority of the jurors chosen had some knowledge of the crime, none reported that the exposure would lead to any bias and all stated that they would decide the case based on the evidence presented in accordance with the court's instructions.  The state court determination is a factual finding presumed by U.S.C §2254 (e)(1) to be correct absent

clear and convincing evidence to the contrary. Neither presumed nor actual prejudice has been demonstrated, so Hetzel's objection to the R&R regarding the state court's denial of her motion for a change of venue/venire will not be sustained. Because reasonable minds might differ, the court will find probable cause for a certificate of appealability as to this issue.

**B.    Ineffective Assistance Of Counsel---Failure To Object To Accomplice Liability Instructions**

A party making a claim of ineffective assistance of counsel under the federal Constitution must show:  (1) that counsel's performance was deficient measured by "reasonableness under prevailing professional norms"; and (2) that counsel's "deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 689 (1984).

The Pennsylvania standard is essentially the same as that of Strickland. To sustain a claim of ineffective assistance of counsel, petitioner must establish that: (1) the underlying claim is of arguable merit; (2) counsel's performance had no reasonable basis; and (3) counsel's ineffectiveness prejudiced the petitioner. Commonwealth v. Todaro, 701 A.2d 1343, 1346 (Pa. 1997). Since it is apparent that a state court decision in accordance with the

standard would not be "contrary to" established federal law, the appropriate inquiry is whether the state court decision, evaluated objectively on the merits, would be an unreasonable application under Strickland.

Hetzel argued the court failed to instruct the jurors that an accomplice must have the specific intent to kill, otherwise he or she cannot be convicted of first degree murder. Hetzel, 822 A.2d at 755. Hetzel contends that the failure to object to not giving this jury instruction constituted ineffective assistance of counsel.

Jury instructions are examined as a whole. Commonwealth v. Lukowich, 875 A.2d 1169, 1174 (Pa. Super. Ct. 2005). The trial court has broad discretion in formulating jury instructions if the law is presented to the jury in a clear, adequate, and accurate manner. Id. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. A reasonable probability is one "which is sufficient to undermine confidence in the outcome." Id. Counsel cannot be deemed ineffective for failing to raise a meritless objection to jury instructions. United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999).

The trial court explained to the jury that each defendant must have a specific intent to kill to be found guilty of first-degree murder.  This was reiterated throughout the jury charge.[2] The state courts properly found that counsel could not have been ineffective for failing to object to the accomplice liability charge because such an objection would have been without merit.

Counsel cannot be deemed ineffective for failing to raise a meritless objection.  Because objection by counsel would have been meritless, the failure of counsel to raise

_____

[2] After the jury had been charged, it requested to be re-instructed on the definition of the crimes charged.  On the issue of accomplice liability, the court re-instructed the jury:

> In a nutshell, what I just told you, that if you want to find someone guilty of criminal homicide, one of the three types, but that the person you do not believe was the actual killer, if you want to find that person guilty of murder of the first degree, but you do not believe that person was the actual killer, in order to find them guilty under either accomplice liability or co-conspirator liability, *that person must still have the specific intent to kill.*
> It did not have to be the specific intent for them to do the killing, it could have been a specific intent for their co-conspirator or for their accomplice to do the killing, *but there had to be a specific intent to kill.*
> *In Pennsylvania, the law is clear that to be convicted of first degree murder, the killer, him or herself, or a co-conspirator or accomplice, must have that specific intent to kill.*

N.T.  at 2068 (emphasis added).

such an objection was not ineffective assistance of counsel
under Strickland.  Hetzel's objection regarding her claim
of ineffective assistance of counsel for failure to object
to the jury instructions for accomplice liability will not
be sustained.

### C.    Motion For Severance

"There is a preference in the federal system for joint
trials of defendants who are indicted together" because
joint trials "promote efficiency and 'serve the interest of
justice by avoiding the scandal and inequity of
inconsistent verdicts.'"  Zafiro v United States, 506 U.S.
534, 537 (1993).  "Joint trials conserve state funds,
diminish inconvenience to witnesses and public authorities,
and avoid delays in bringing those accused of crime to
trial."  United States v. Lane, 474 U.S. 438, 448 (1986).

Mutually antagonistic or irreconcilable defenses may
be so prejudicial in some circumstances that severance is
mandated.  Zafiro, 506 U.S. at 538.  The Supreme Court has
explicitly declined to adopt a bright line rule mandating
severance whenever co-defendants have conflicting defenses.
Id.  District courts should grant severance "only if there
is a serious risk that a joint trial would compromise a
specific trial right of one of the defendants, or prevent
the jury from making a reliable judgment about guilt or

innocence." Id. at 539.[3] Very few convictions have been reversed for failure to grant a severance because of mutually antagonistic or irreconcilable defenses.

In Pennsylvania, the decision to grant a motion for severance is a matter within the discretion of the trial court and should not be overruled absent a manifest abuse of discretion. Commonwealth v. Chester, 587 A.2d 1367, 1378 (Pa. 1991). Joint trials are advisable where conspiracy is charged unless a party can show that he will be prejudiced by a joint trial. Chester, 587 A.2d at 1372-73. A defendant must show a real potential for prejudice, not just mere speculation. Commonwealth v. Jones, 668 A.2d 491, 501 (Pa. 1995). The existence of antagonistic defenses is a factor to be considered, but more than a bare assertion of antagonism is required. Chester, 587 A.2d at 1372. "Defenses only become antagonistic when the jury, in order to believe the testimony offered on behalf of the one defendant, must disbelieve the testimony offered by his or her co-defendant." Jones, 668 A.2d at 501. Mere hostility between defendants or that one may try to save himself at

---

[3] "Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." Id. at 539. The Court cited three specific examples in which this might take place: (1) "a

the expense of a co-defendant is in itself not sufficient ground to grant a severance.  Id.  "In fact, it has been asserted that the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together."  Chester, 587 A.2d at 1372.

Pennsylvania declines to apply a bright line rule of antagonism and requires defendants in joint trials to demonstrate a potential for real prejudice rather than mere speculation.  This is indistinguishable from the Supreme Court formulation that a defendant must demonstrate a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Pennsylvania law is not "contrary to" federal law as promulgated by the Supreme Court.

---

complex case" involving "many defendants" with "markedly different degrees of culpability," (2) a case such as Bruton v. United States, 391 U.S. 123 (1968), where evidence that is probative of one defendant's guilt is technically admissible only against a codefendant, and (3) a case where evidence that exculpates one defendant is unavailable in a joint trial.  Zafiro, 506 U.S. at 539. A defendant is not entitled to severance merely because she may have a better chance of acquittal in a separate trial. Id.  at 540.

A state court decision is an unreasonable application of Supreme Court precedent if the court "correctly identifies the governing legal rule but applies it unreasonably to the facts" of the case. Penry, 532 U.S. at 792. The facts at issue in Hetzel's post-trial motion and appeal were the allegedly antagonistic testimony of Judd, Hetzel, and Hetzel's mother. Cara Judd was a Commonwealth witness in the case in chief. A. 64 at 35-36.

Defenses become antagonistic when the jury must disbelieve the testimony of one defendant in order to believe the testimony of a co-defendant, but Bloss neither testified nor offered any evidence, so the jury had no opportunity to disbelieve any co-defendant testimony. Id. The state court conclusion that antagonism could not exist is not an unreasonable application of Zafiro. Hetzel did not have a "specific trial right" to prevent a Commonwealth witness from offering evidence that conflicted with her defense theory. Hetzel's due process claim based upon the denial of her motion for a severance is not meritorious.

Hetzel makes two additional arguments in her habeas petition. First, Hetzel contends that being forced into a joint trial with Bloss prevented her from exercising her right to call character witnesses to her reputation for

27

nonviolence. Hetzel argued in the state courts that her attorney's failure to present character witnesses was ineffective assistance of counsel, but not that failure to sever the case denied her due process right to call character witnesses.

A prerequisite to federal habeas corpus relief is exhaustion of all claims in state court prior to requesting federal relief. A claim must have been "fairly presented to the state courts." Bronshtein v. Horn, 404 F.3d 700, 725 (3d Cir. 2005). To fairly present a claim to the state courts, a petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." Id. "Mere similarity of claims is insufficient to exhaust." Keller v. Larkis, 251 F.3d 408, 413 (3d Cir. 2001). This claim remains unexhausted.

Hetzel contends Zafiro was violated by the Superior Court ruling that antagonistic defenses have to be based on conflicting testimony of defense witnesses, in contrast to conflicting defense theories. Hetzel never argued in state court that antagonistic defense theories required granting her motion for severance. Because Hetzel's claims regarding the denial of her motion for severance are either

unexhausted or lack merit, her objections will not be sustained.

### D.     Dismissal Of Juror

The final objection of petitioner is that she was denied her Sixth Amendment right to a jury trial and her Fourteenth Amendment right to due process when the trial court dismissed a juror after the trial began.  Hetzel argued in state court that striking the juror was an error under Pennsylvania law but never argued the decision to strike the juror also violated her Sixth Amendment right. Since Hetzel's Sixth Amendment claim was not fairly presented in state court and is unexhausted, her objection will not be sustained.

### III.   CONCLUSION

The Report and Recommendation of the Magistrate Judge, recommending petitioner's claims regarding change in venue/venire, ineffective assistance of counsel, severance, and dismissal of juror be denied, will be approved and adopted and the petition will be dismissed without an evidentiary hearing.  Because reasonable minds might differ on whether the Constitution required a change of venue/venire for sensational publicity, petitioner's objection to the recommendation that there is no probable cause for issuing a Certificate of Appealability will be

sustained on that issue only.  An appropriate order will follow.